CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

JUL 19 2019

JULIA C. DUDLEY, CLERK
BY: _____
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

| | | |
|---|---|---|
| ALLESANDRO CANCIAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 7:18-cv-00283 |
| v. | ) | |
| | ) | |
| HANNABASS AND ROWE, LTD., | ) | |
| | ) | |
| and | ) | |
| | ) | |
| LINDSAY MICHELLE STINSON, | ) | |
| | ) | |
| Defendants. | ) | By:   Michael F. Urbanski |
| | ) | Chief U.S. District Judge |

### MEMORANDUM OPINION

This matter comes before the court on a number of motions filed by defendants Hannabass and Rowe, Ltd. ("Hannabass") and Lindsay Michelle Stinson ("Stinson"). The first of these is Hannabass and Stinson's (collectively, "defendants") motion for summary judgment, filed on June 19, 2019. ECF No. 48. Plaintiff Allesandro Cancian ("Cancian") responded to this motion on July 8, 2019. ECF No. 50. Defendants then filed a motion to strike this response on June 9, 2019, ECF No. 51, and a supplemental motion arguing additional grounds to strike Cancian's response on June 10, 2019, ECF No. 52. Cancian responded to both motions to strike on July 12, 2019. ECF No. 54. Defendants replied to Cancian's brief in opposition to the motion on July 12, 2019. ECF No. 54.

For the reasons articulated below, the court now **DENIES** defendants' motions to strike, ECF Nos. 51 & 52, and **DENIES** defendants' motion for summary judgment, ECF No. 48.

Cancian took the photograph that would come to be titled "Speeding Fall" ("Speeding Fall" or "the photo") on July 11, 2011. ECF No. 49-1, at 1. While the original photo was taken during the summer, Cancian altered the colors of the leaves on the trees on either side of the road so that the photo appeared to depict a roadway in the fall, as the leaves were changing. Id. Cancian also used a "smoothing effect" on the road. Id. Cancian's purpose in taking the photo was artistic expression. ECF No. 49-8, at 1. He posted the photo on the website "www.500px.com," a website that "provides exposure and licensing opportunities to photographers," sometime in March of 2012. Id. The photo was registered with the United States Copyright Office on May 5, 2017.[1]

Stinson is the sole owner and principal of Stinson Communications LLC ("Stinson Communications"), a Virginia limited liability company. ECF No. 41-11, at 1. Stinson Communications' primary business is to provide marketing and website development to its customers. Id. Hannabass is a corporation headquartered in Roanoke, Virginia and in the business of auto body repair. ECF No. 16, at 1; ECF No. 49-12, at 1. Hannabass contracted with Stinson Communications to develop and maintain a website providing information on the services Hannabass provides, its hours of operation, and certain informational articles. ECF No. 49-12, at 1–2. Stinson owns the licensing rights to numerous stock photographs through a variety of stock photograph companies. ECF No. 49-11, at 1–2. In creating a page on Hannabass' website for an article on safe driving in fall weather, Stinson selected "Speeding Fall" from these photos because it appeared to depict a roadway in autumn. Id.

---

[1] "Speeding Fall" holds the Copyright Registration Number VA 2-062-573. ECF No. 49-20, at 1.

On February 7, 2017, Stinson was notified by counsel that Cancian owned the "Speeding Fall" photo and that use of that photo was prohibited. ECF No. 49-11. Stinson removed the photo the same day she was so alerted. Id. Cancian filed suit on June 20, 2018, pursuing damages for Stinson's and Hannabass' infringement. ECF No. 1.

## II.

Pursuant to Federal Rule of Civil Procedure 56(a), the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Glynn v. EDO Corp., 710 F.3d 209, 213 (4th Cir. 2013). When making this determination, the court should consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . [any] affidavits" filed by the parties. Celotex, 477 U.S. at 322. Whether a fact is material depends on the relevant substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. (citation omitted). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. See Celotex, 477 U.S. at 323. If that burden has been met, the non-moving party must then come forward and establish the specific material facts in dispute to survive summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).

In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the non-moving party.

Glynn, 710 F.3d at 213 (citing Bonds v. Leavitt, 629 F.3d 369, 380 (4th Cir. 2011)). Indeed, "[i]t is an 'axiom that in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" McAirlaids, Inc. v. Kimberly–Clark Corp., No. 13-2044, 2014 WL 2871492, at *1 (4th Cir. June 25, 2014) (internal alteration omitted) (citing Tolan v. Cotton, 134 S. Ct. 1861, 1863 (2014) (per curiam)). Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ." Anderson, 477 U.S. at 255. However, the non-moving party "must set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.'" Glynn, 710 F.3d at 213 (quoting Anderson, 477 U.S. at 252). Instead, the non-moving party must show that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Res. Bankshares Corp. v. St. Paul Mercury Ins. Co., 407 F.3d 631, 635 (4th Cir. 2005) (quoting Anderson, 477 U.S. at 249). "In other words, to grant summary judgment the [c]ourt must determine that no reasonable jury could find for the nonmoving party on the evidence before it." Moss v. Parks Corp., 985 F.2d 736, 738 (4th Cir. 1993) (citing Perini Corp. v. Perini Const., Inc., 915 F.2d 121, 124 (4th Cir. 1990)).

## III.

As a threshold matter, the court shall address two motions by defendants to strike Cancian's memorandum in opposition to the motion for summary judgment. ECF Nos. 51 & 52. Defendants point out in their first motion to strike that they timely filed their motion for summary judgment on June 19, 2019, in accordance with the deadlines set by the Scheduling Order. ECF No. 48. Cancian, on the other hand, filed his response to this motion on July 8,

2019, five days after the July 3 deadline to respond to defendants' motion. ECF No. 50. Defendants argue that, in light of Cancian's tardy filing, the court should strike his response to the motion. ECF No. 51.

While the court applauds defendants' timeliness and discourages Cancian's tardiness, a motion to strike is "a drastic remedy which is disfavored by the courts and infrequently granted." Clark v. Milam, 152 F.R.D. 66, 70 (S.D. W.Va. 1993). Federal Rule of Civil Procedure 6(b) gives the court discretion to extend a deadline after its passage upon a showing of "excusable neglect"; "[e]xcusable neglect is not easily demonstrated, nor was it intended to be . . . the burden of demonstrating excusability lies with the party seeking the extension and a mere concession of palpable oversight or administrative failure generally has been held to fall short of the necessary showing . . . " Thompson v. E.I. DuPont de Nemours & Co., 76 F.3d 530, 534 (4th Cir. 1995) (internal citations omitted). In considering whether a party has presented excusable neglect, the court must consider four elements: (1) "the danger of prejudice to [the non-moving party]," (2) "the length of the delay and its potential impact on judicial proceedings," (3) "the reason for the delay, including whether it was in the reasonable control of the movant, and" (4) "whether the movant acted in good faith." Pioneer Inv. Servs. v. Brunswick Assocs. Ltd. P'ship, 507 U.S. 380, 395 (1993).

Cancian's professed excuse, that the reporting company hired to produce a transcript of two key depositions failed to do so despite repeated entreaties, see ECF No. 50-2, does perhaps fall into the category of "administrative failure," but the court sees no reason that a five-day delay will prejudice defendants. Defendants themselves do not argue they have suffered prejudice, except perhaps that the court will now consider Cancian's late-filed

arguments—a clearly insufficient proffer of prejudice. See Walton v. Baker Hughes Oilfield Operations, Inc., No. 1:16cv141, 2017 WL 5196643, at *4 (N.D. W.Va. Nov. 9, 2017) ("[A]lthough Walton argues that he is prejudiced by the late-filed response, he provides no basis for this argument other than the possibility that the Court will heed its contentions (citation omitted). Were this alone sufficient, every late-filed brief would result in prejudice and consideration of the factor would be futile.").

In their supplemental motion to strike, defendants argue that plaintiff's counsel's explanation for his late filing, submitted in a sworn declaration accompanying his response, is false. ECF No. 52. Counsel for Cancian states in his declaration that he made repeated requests for the deposition transcripts but did not hear back until after the deadline to respond to defendants' motion. ECF No. 50-2. Defendants assert in their supplemental motion to strike that counsel for Cancian in fact only made one request, on July 3, 2019. ECF No. 52, at 2. Defendants include a copy of the emailed request with this motion and encourage the court to give "the veracity of a declaration made by an attorney under penalty of perjury, particularly at the expense of a third party, . . . further scrutiny." Id. The court can only assume that defendants' counsel is implying a lack of good faith on the part of plaintiff's counsel.

In responding, counsel for Cancian submits screenshots off his cellphone, documenting numerous attempts to contact the recording company by phone on several different days, as well as the previously submitted emails. ECF No. 53-2. The court will thus ignore any aspersions defendants' counsel attempts to cast. Even if the court agrees that the third of the above elements (the reason for the delay and whether it was in the reasonable

control of the movant) militates towards granting the motion to strike, the other three sway the court to consider Cancian's response. The court will **DENY** the motions to strike.

Cancian's first exhibit in support of his response to the motion for summary judgment, however, gives the court pause. See ECF No. 50-1. In lieu of the deposition transcripts Cancian was unable to obtain, Cancian's counsel offers handwritten notes taken during the depositions and a sworn declaration explaining the nature of these. ECF No. 50-2. In this declaration, counsel also states that, should it become necessary, he will testify to what the deponents said. Id. at 1.

"A deposition upon oral examination is a valuable discovery tool by which a witness gives oral testimony under oath." Steven S. Gensler, Federal Rules of Civil Procedure, Rules and Commentary, Rule 30 (2019). While deponents make their statements under oath, the attorney doing the deposing, and perhaps taking notes as he does so, is under no such obligation to jot down only the unvarnished truth. Courts do not rely upon unsworn, unsigned witness statements in deciding motions for summary judgment. Cetina v. Newbold Servs., No. CA 6:12-2222-TMC, 2013 WL 5596921, at *7 (D.S.C. Oct. 11, 2013) ("The unsworn, unsigned witness statements that the Newbold Defendants attached to their motion for summary judgment (many which include handwritten notes) have not been submitted under oath, and thus the Court will not rely on them in making its summary judgment determination."). The court thus will not consider Cancian's first exhibit submitted with his response in opposition to the motion for summary judgment, ECF No. 50-1, in deciding this motion.

# IV.

Defendants make four arguments in favor of summary judgment: (1) that Stinson cannot be held individually liable for copyright infringement committed by Stinson Communications, LLC; (2) that Hannabass cannot be held vicariously liable for copyright infringement committed by Stinson Communications; (3) that the infringement in this case is excused by the fair use doctrine; and (4) that Cancian cannot sustain his case because he has made no showing of damages. The court will address each argument individually.

Defendants argue that Stinson cannot be held individually liable for any infringement claim committed by Stinson Communications, a limited liability company that ordinarily shields its members and officers from personal liability, because Cancian "has no knowledge of whether Stinson Communications downloaded the photo without a watermark or any identifying signature" and has "no evidence that Stinson was the dominant influence at Stinson Communications LLC or that Stinson determined policy that resulted in the infringement." ECF No. 49, at 8. Defendants concede that "Stinson selected the photograph for use by Stinson Communications LLC to post to the H&R website," but argue that "this fact alone is not sufficient to establish liability." Id. On these grounds, defendants argue that Stinson is shielded as an individual from liability for what Stinson Communications did as a limited liability entity. Id.

The Copyright Act, as interpreted by the courts, extends personal liability for the actions of corporations and LLCs under certain circumstances. See 17 U.S.C.A. § 501(a–b) (2002) ("Anyone who violates any of the exclusive rights of the copyright owner as provided by sections 106 through 122 . . . is an infringer of the copyright . . . . The legal or beneficial

owner of an exclusive right under a copyright is entitled . . . to institute an action for an infringement . . . ."); Universal Furniture Int'l, Inc. v. Frankel, 835 F. Supp. 2d 35, 50 (M.D.N.C. 2011), aff'd, 538 F. App'x 267 (4th Cir. 2013) (imposing personal liability on a corporate officer for copyright infringement by the corporation). Joint and several liability for a corporate officer in the context of copyright infringement will lie "where the officer was the dominant influence in the corporation, and determined the policies which resulted in the infringement." Broad Music, Inc. v. It's Amore Corp., No. 3:08CV570, 2009 WL 1886038, at *5 (M.D. Pa. June 30, 2009) (citing Sailor Music v. Mai Kai of Concord. Inc., 640 F. Supp. 629, 634 (D.N.H. 1984). Defendants contend that not enough has been produced to show that Stinson either was "the dominant influence" at Stinson Communications or "determined the policies that resulted in the infringement." ECF No. 49, at 8. The court disagrees. Stinson is the owner, principal, and sole member of Stinson Communications. ECF No. 49-11, at 1. Defendants admit that she personally selected the "Speeding Fall" photo for use on Hannabass' website. Id. This on its own is enough to create a question of material fact as to whether Stinson was the dominant influence at her company and whether she determined the policies that resulted in the alleged infringement.

## V.

Defendants argue that Hannabass had no "involvement in the design or construction" of the Hannabass website. ECF No. 49, at 6. They argue that, because Stinson Communications was hired as an independent contractor (rather than an employee) to design and build Hannabass' website, it was solely responsible for the content and photo selection of

that website and its actions cannot be imputed to Hannabass. Id. Defendants thus argue that Cancian cannot hold Hannabass liable for the use of "Speeding Fall." Id.

On the contrary, there is no doubt that, in certain circumstances, a person or entity can be found to have infringed a copyright based on the acts of another. See Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd., 545 U.S. 913 (2005) (recognizing secondary liability under copyright act); Sony Corp. v. Universal City Studios, Inc., 464 U.S. 417, 435 (1984) (noting existence of vicarious liability in the copyright context despite absence of express language in copyright statute). One source of such secondary liability is vicarious liability, which, in the context of copyright infringement, will lie where a defendant possesses both the right and ability to supervise the infringing activity and an obvious and direct financial interest in the exploited copyrighted materials. Nelson Salabes, Inc. v. Morningside Development, LLC, 284 F.3d 505, 513 (4th Cir. 2002). See also Universal Furniture Intern, 835 F. Supp. 2d at 50 (holding that the officer of a closely held company that was the judgment debtor for an $11 million award for damages for the infringement of a copyright holder's furniture designs was vicariously liable for the company's infringement because the officer had both the ability to supervise the distribution of the furniture and a financial interest in exploiting the copyrighted furniture). Critically, a "lack of knowledge that the primary actor is actually engaged in infringing activity is not a defense" where both of the above elements are satisfied. EMI April Music, Inc. v. White, 618 F. Supp. 2d 497, 507 (E.D. Va. May 22, 2009) (holding that a defendant who owned and operated the establishment where copyright infringement took place was vicariously liable for that infringement).

Dennis Holdren, president and owner of Hannabass, stated in his declaration in support of summary judgment that Hannabass hired Stinson Communications to create its commercial website. ECF No. 49-12, at 1. Whether hired as an employee or independent contractor, the law on this issue is clear that such a relationship creates at least a question of fact as to the right and ability of Hannabass to supervise the creation of its own website. See EMI April Music, 618 F. Supp. 2d at 507. Further, because "Speeding Fall" was posted on Hannabass' commercial website, sufficient evidence of an obvious and direct financial interest in this infringement has been produced such that summary judgment is inappropriate. The court **DENIES** defendants' motion to dismiss Hannabass as a defendant from this case.

## VI.

Next, defendants assert they are not liable for copyright infringement because the use of "Speeding Fall" on Hannabass' website constituted fair use. ECF No. 49, at 10. "From the infancy of copyright protection, some opportunity for fair use of copyrighted materials has been thought necessary to fulfill copyright's very purpose, '[t]o promote the Progress of Science and useful Arts . . . .'" Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 575 (1994) (citing U.S. Const., Art. I, § 8, cl. 8). The doctrine of fair use is an affirmative defense and "an equitable rule of reason, which permits courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster." Stewart v. Abend, 495 U.S. 207, 236 (1990). A finding of fair use is a complete defense to an infringement claim. Bouchat v. Baltimore Ravens Ltd. P'tship, 737 F.3d 932, 937 (4th Cir. 2013). Fair use is now codified in Section 107 of the Copyright Act, which provides in relevant part:

> [T]he fair use of a copyrighted work, including such use by reproduction in copies . . . , for purposes such as criticism, comment, news reporting, teaching . . . , scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—
>> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>> (2) the nature of the copyrighted work;
>> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>> (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107. Fair use analysis must be conducted on a "case-by-case" basis; the statutory factors may not "be treated in isolation," but must "[a]ll . . . be explored, and the results weighed together, in light of the purposes of copyright." Campbell, 510 U.S. at 577–78. The court must ultimately determine whether a use is the type "that furthers the essential goal of copyright law and should be excused from liability for infringement." Estate of Smith v. Cash Money Records, Inc., 253 F.Supp.3d 737, 749 (S.D.N.Y. 2017). The court thus shall go factor by factor and apply each to the facts at hand.

## A.

The first factor of the fair use doctrine inquires into the purpose and character of the infringing use and asks if it "adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." Campbell, 510 U.S. at 579. This requires a two-part inquiry; first, the court must ask if the use is transformative, then the court asks to what extent the use serves a commercial purpose. Id. at 578. The essential thrust of the transformative inquiry is to determine whether the use renders the work original in some

way, or whether it "merely 'supersede[s]' the objects' of the original creation." Id. at 579 (alteration in original) (quoting Folsom v. Marsh, 9 F. Cas. 342, 348 (C.C.D. Mass 1841). To be transformative, a use must do "something more than repackage or republish the original copyrighted work." Authors Guild, Inc. v. HathiTrust, 755 F.3d 87, 96 (2d Cir. 2014). Instead, the use must either alter or add something to the work, or in lieu of this, "employ the quoted matter in a different manner or for a different purpose from the original, thus transforming it." A.V. ex rel. Vanderhye v. iParadigms, LLC, 562 F.3d 630, 638 (4th Cir. 2009) (internal citations omitted).

In arguing that their use of the photo was transformative, defendants struggle to distinguish this case from Brammer v. Violent Hues Prods., 922 F.3d 255 (4th Cir. 2019). The plaintiff in Brammer was a commercial photographer who brought suit against a film production company that had posted a photo he had taken on the Internet. Id. at 261. The photo in question, "Adams Morgan at Night," depicted "a busy street during the evening in the Adams Morgan neighborhood" of Washington, D.C., "with the vehicle traffic rendered as red and white light trails." Id. The film production company found the photo through a Google search and used it on its website promoting the Northern Virginia International Film and Music Festival; the photo was used on a page that highlighted various tourism attractions around the Washington metropolitan area of Adams Morgan. Id.

The film production company argued that the use of "Adams Morgan at Night" was transformative because of the new and different context—the photo was placed beside a list of tourist attractions. Brammer, 922 F.3d at 263–64. The court observed that, while a wholesale reproduction of a copyrighted work may be transformative when the work is placed

in a new context to serve a new purpose, the secondary use "still must generate a societal benefit by imbuing the original with new function or meaning." Id. at 263. After noting that, generally speaking, courts often find contextual changes sufficiently transformative in the two specific scenarios of technological use and documentary use, the court found that neither such scenario applied:

> The copying here does not fall into either of these categories . . . . Instead, Violent Hues' sole claim to transformation is that its secondary use of the Photo provided film festival attendees with "information" regarding Adams Morgan. But such a use does not necessarily create a new function or meaning that expands human thought; if this were so, virtually all illustrative uses of photography would qualify as transformative.

Id. at 264. After examining the remaining elements of the fair use doctrine, the court found the film production company had failed to show that the use of "Adams Morgan at Night" had been fair use. Id. at 269.

Brammer is clearly and inescapably analogous to the case at hand, but defendants attempt to distinguish these facts by arguing that the Brammer defendant copied the plaintiff's photo with the intention of identifying the same location captured by the photo in promoting a film festival, while here, Stinson did not use "Speeding Fall" because of the location it depicted, or indeed because she wished to identify any particular location. ECF No. 49, at 11–12. Neither did Stinson use the photo for its artistic value. Id. Defendants contend:

> Stinson's use does not highlight any artistic or expressive content. With all due respect to plaintiff, any picture out of the 14,000 images listed in Exhibits 16 and 17 would have served Stinson Communications' needs.
> The photo was used for informational purposes in an article on safe driving. The text accompanying the photo discusses safe

14

driving tips and hazards of which to be aware. This gives the
viewer a new meaning and context in which to view the photo.

Id. at 12. Defendants also point out that the photo was reduced in size to fit with the

accompanying text and that a portion of the photo was used as a page header on "Fall Driving

Tips," containing the Hannabass' logo. Id. at 14–15. While admitting that this goes more to

the third element of fair use than the first, defendants argue this also shows the transformative

nature of the use of "Speeding Fall." Id.

The court finds little, if any, transformative value in the use of the photo on Hannabass'

website. The context of the use, placement above and next to an article about safe driving

during the fall, may alter the meaning of the photo somewhat. See ECF No. 49-19, at 1. An

individual reading this article would view "Speeding Fall" as a reference to the fall season

rather than as an artistic work. Additionally, nothing about the safe driving tips offered

encourages a reader to note the photo-editing techniques applied to "Speeding Fall." All the

same, Cancian took a picture of a roadway surrounded by a forest and intentionally altered it

to look like a fall scene rather than a summer scene—though the artistic expression and

technical proficiency meant little to Stinson when she posted the photo on Hannabass'

website, the photo was chosen because it depicts exactly what Cancian intended it to—a road

in autumn. One assumes that any individual viewing Cancian's photo in any context would see

it as a road in autumn. Accompanying the photo with an article on driving safety doesn't

change that interpretation.

Stinson's use of the photo is neither a technological function nor a documentary

function. In the technological function situation, as described by the court in Brammer, the

function of the copied work is indifferent to any expressive aspect. 922 F.3d at 264. For example, courts have found the total reproduction of student essays for a plagiarism detection service transformative because the database served an "entirely different function that was unrelated to the expressive content of those essays." Vanderhye, 562 F.3d at 639. In the documentary function situation, the use of the copied work serves a documentary purpose and "may be important to the accurate representation of historical events." Brammer, 922 F.3d at 264. While the documentary function may come closest to explaining Stinson's use of Cancian's photo, any such argument clearly falls quite short. "Speeding Fall" arguably served a representational, informative purpose, but was certainly far from necessary to provide historical accuracy (or accuracy of any kind) to the article on safe driving in the fall. The court thus concludes that the use of "Speeding Fall" is not transformative. This conclusion weighs against a finding of fair use.

As regards the second part of this element's analysis, the court finds that the use of the photo was only somewhat commercial, despite the fact that the photo was used on a commercial website. Neither Stinson nor Hannabass was attempting to sell the photograph, advertise photographic editing techniques, promote tourism, or even draw attention to the photo. See ECF No. 49-19 (a screenshot of the Hannabass' webpage "Fall Driving Tips"). And while certainly anything posted on Hannabass' website could be termed commercial, since the website itself is commercial, the photo's use on this particular page doesn't appear to be the promotion of Hannabass, but the delivery of several safety tips. See id. Defendants contend that, to the extent the use of the photo was commercial, the commercial gain has been so "tenuous" that neither party is able to identify a financial benefit. ECF No. 49, at 13.

"The crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from the exploitation of the copyrighted material without paying the customary price." Harper & Row, Publishers, Inc. v. Nation Enterprises, 471 U.S. 539, 562 (1985). Defendants have established that Stinson Communications had the license to use several stock photos depicting fall roadway scenes. ECF No. 49-11, at 1. Defendants have also presented evidence showing that Stinson mistakenly selected this photo; she could have selected any number of photos that would have served her needs and for which she owned licenses. Id. at 2. She had no need of this photo in particular and, with so many other options, stood to gain nothing from using it without paying for a license. Cancian offers absolutely no evidence rebutting this.

Having found that the use of "Speeding Fall" was not transformative, but was only somewhat commercial, the court finds that the first factor weighs against the conclusion that defendants' use of the photo was fair use.

## B.

The second factor of the fair use doctrine looks to the nature of the copyrighted work. 17 U.S.C. § 107(2). Cancian describes his photo as a creative work; this therefore places the photo "closer to the core of works protected by the Copyright Act." Bouchat, 737 F.3d at 943 (internal quotation marks omitted). If, however, "the disputed use of the copyrighted work is not related to its mode of expression but rather to its historical facts, then the creative nature of the work" matters far less than it otherwise would. Vanderhye, 562 F.3d at 640 (internal quotation marks omitted). Defendants argued that Stinson chose "Speeding Fall" purely as a factual depiction of a road in the fall. ECF No. 49, at 16. For that reason, any number of

photos could have served the same purpose. The photo was intended to serve purely as a reference to a season. The use of the photo is thus unrelated to any creative decisions made by Cancian in taking and editing the photo. The court finds that the second factor weighs in favor of a finding of fair use.

## C.

The third factor examines the "amount" and "substantiality" of the use of the copyrighted work. 17 U.S.C. § 107(3). Here, the court considers factors such as whether the photo was reproduced in its entirety or in part, or whether the photo was enlarged or shrunk. Sundeman v. Seajay Soc'y, Inc., 142 F.3d 194, 205 (4th Cir. 1998). While the photo was reduced to approximately one fourth the size of the original, it was reproduced in its entirety, and then was reproduced again—a portion of the photo was used as a "banner" photo at the top of the website page. ECF No. 49-19, at 1. The court finds that the third factor weighs against a finding of fair use.

## D.

The fourth and final factor looks to the effect of the use upon the potential market for the copyrighted work. 17 U.S.C. § 107(4). The Supreme Court has stated that the fourth factor is "undoubtedly the single most important element of fair use." Harper, 471 U.S. at 566. The court is "required to determine whether the defendants [use of the logo] would materially impair the marketability of the work and whether it would act as a market substitute for it." Bond, 317 F.3d 385, 396 (4th Cir. 2003) (internal quotation marks omitted). Defendants argue that there is no evidence that the appearance of the photo on Hannabass' website had an adverse effect on the market for the photograph, pointing to Cancian's earnings from past

licenses versus past settlement agreements. ECF No. 49, at 18. To date, Cancian has licensed this photograph four separate times, earning $1,625.00. ECF No. 49-7. He has also entered into two settlement agreements for infringement for a total of $5,250.00. ECF No. 49-20. Defendants argue that Cancian cannot say how he would calculate the license fees for the photograph or identify any market factors that would determine its value. ECF No. 49, at 18. He has not marketed the photo and has not offered it for sale. ECF No. 49-8, at 14. Defendants argue that this absence of evidence indicates that Cancian cannot create a question of fact as to whether their use of "Speeding Fall" affected the potential market for the photo. ECF No. 49, at 18.

Meanwhile, defendants argue that Hannabass and Stinson Communications have derived no financial benefit from the use of the photo and that there is no evidence that the photo contributed to any increased internet traffic to Hannabass' autobody website. ECF No. 49, at 19. Defendants also point out that photographs of fall roadways are more plentiful than one would imagine. Apparently, as defendants detail in their brief in support of summary judgment, on "Shutterstock" alone, over 14,000 images can be found by searching "highway," "leaves," and "fall." These "similar, if not identical" photographs can be licensed for $2.90 per month of use. Id. Defendants argue that, given the fact that so many similar photos can be had so easily, the idea that defendants' use of "Speeding Fall" had any true impact on the marketplace is unimaginable. Id.

Defendants miss the mark in their argument by focusing on their own use of this photo specifically rather than the consequences of permitting uses such as this broadly. "The fourth fair use factor . . . requires courts to consider not only the extent of market harm

19

caused by the particular actions of the alleged infringer, but also whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market for the original." Campbell, 510 U.S. at 590 (internal quotation marks and citations omitted). Murphy v. Millennium Radio Grp. LLC, 650 F.3d 295, 308 (3d Cir. 2011), examined this factor in the context of the posting of a copyrighted picture taken by a professional photographer on a website news article. The court noted that, "[i]f it were possible to reproduce [a photographer's] unaltered work, as a whole, without compensation under the guise of news reportage . . . it would surely have a substantially adverse impact on his ability to license his photographs." Id. Likewise, Cancian is a commercial photographer who engages in the licensing of photographs for profit. Were website operators permitted to use copyrighted photographs without obtaining licenses on a grand scale, sites like "Shutterstock" would no longer be able to charge even $2.90 per month for their myriad fall foliage photographs. The court finds that the fourth factor weighs in favor of a finding of fair use.

Having weighed the above four factors, the court disagrees with defendants. The fair use doctrine is inapplicable to these facts.

## VII.

Finally, defendants argue that Cancian cannot sustain his case without proof of damages, citing deposition testimony showing that Cancian does not know how much he earns from his photographs available for license. ECF No. 49, at 20. As has already been stated, however, Cancian has previously licensed this photo on four occasions, earning $1,625, and has entered into settlement agreements including retroactive licenses twice in the amount of

$5,250. ECF No. 49-7; ECF No. 49-20. This evidence constitutes proof of damages, however small those damages might be.

## VIII.

For the reasons explained above, the court **DENIES** defendants' motions to strike, ECF Nos. 51 & 52, and **DENIES** defendants' motion for summary judgment, ECF No. 48.

An appropriate Order will be entered this day.

Entered: This _19th_ day of July, 2019

/s/ Michael F. Urbanski

Michael F. Urbanski
Chief United States District Judge